James H. Rohn, Jr. et al. Abalance v. William P. Barr, Attorney General et al. Mr. Dreyluski for the Abalance, Mr. Meltzer, Ms. Patterson for the Appellees. Before you start, Mr. Dreyluski, I just want to thank all the attorneys for the expedition with which you've been filing briefs. We obviously wanted to be able to sign this in a timely manner. Given pending executions, and we're very grateful for what we know has been nights and weekends and long hours' work on all of your ends. You may proceed. Thank you, Your Honor. Good afternoon, and may it please the Court. I'm Alex Dreyluski, pro bono counsel to Appellant Corey Johnson, and today I'll be speaking on behalf of all appellants. And just to echo the thanks, we want to thank the Court for scheduling this argument so quickly in this obviously enormously important case. I'd like to turn first, if I could, to the Food, Drug, and Cosmetic Act claim. The circumstances in which this case now sits, we submit, are extraordinary. The district court has held conclusively that defendants are executing prisoners in a way that violates federal law, and yet plaintiffs have been left with no remedy whatsoever for those proven violations and no way to prevent defendants from continuing to act contrary to law. This result was reached in error for the following reasons. First, under Section 706 of the APAA, plaintiffs were not required to show irreparable harm to prevent defendants' unlawful conduct. Second, even if plaintiffs were required to do so, the Court's assessment of the evidence regarding irreparable harm was fundamentally flawed because it applied the wrong standard based on its misreading of the Supreme Court's per curiam decision in Lee. And third, regardless of the district court's assessment of the evidence, it independently erred by misconstruing the harm to plaintiffs based on defendants' continuing violations. Turning first to Section 706 of the APAA, the district court ignored the plain language of this section, which provides in no uncertain terms that a reviewing court shall hold unlawful and set aside agency action not in accordance with the law, with no further requirement that plaintiffs show irreparable harm. Now, we know that when Congress wanted to require irreparable harm, it knew exactly how to do so, and we can look no further than Section 705 of the APAA itself. But even accepting your statutory argument, Mr. Jalewski, here you're asking for more than a declaration that the protocol is invalid. You're also seeking to enjoin actions contrary to the FDCA. You're seeking to enjoin the government from proceeding without a prescription in advance of the administration of the lethal injection. So don't we have to find irreparable harm? Don't we have to find bases to actually enjoin that action? So, Judge Pillard, I think that the answer is no, and that's based on national mining, this court's decision by the late Judge Williams. In that case, what the court emphasized is both the APAA's shall set aside language, which was characterized as a command, but also then the release that was awarded based on the agency's exceeding its power under the APAA and under 706. The court awarded an injunction from the agency enforcing the set-aside regulation, essentially an injunction, a nationwide injunction, and said critically that no showing of irreparable harm was necessary. We think the same reasoning applies here. You're not dealing with a preliminary injunction, the merits of which are still in dispute. We have conclusive and final judgment on this issue. Judge Chutkin ruled that the defendants here are violating the FDCA and thereby acting contrary to law. I'm sorry, wasn't national mining decided before the Supreme Court's decision in eBay, which really has clarified a kind of a cross-cutting understanding that permanent injunctive relief depends on a finding of irreparable harm? It was before, Your Honor. We submit that eBay doesn't change the analysis. eBay was obviously not an APA case. It was a dispute arising out of the Patent Act, and the Patent Act itself had specific language in there about permissive injunctive relief. When you're dealing with relief under Section 706 of the APA, we submit national mining is still good law, and what it instructs is that an injunction can issue without a showing of irreparable harm once an unlawful act is determined finally and conclusively. But the government also says that their authority to conduct the execution by lethal injection doesn't derive from the protocol. So this isn't a case in which were we to say the protocol violates the Food, Drug, and Cosmetic Act, that they would lack authority. The authority derives from the Death Penalty Act, and indeed they've said they don't even need a protocol to proceed. So at bottom, there's a question whether the action needs to be enjoined, or let me just put it this way. Assuming that we disagree with you that the APA standing alone would support the kind of injunction that would give at least Mr. Meltzer's clients the relief that they seek, tell us about the irreparable harm. I know in your briefs you've argued that the kind of irreparable harm needed for the Eighth Amendment, needed for an injunction under the Eighth Amendment is different from the harm, in other words, that one could enjoin a violation of the Food, Drug, and Cosmetic Act based on irreparable harm that might not rise to the level of an Eighth Amendment violation. And just as a factual matter, I'm interested in what you're pointing to, because in your briefing, you do seem to point to the same harm for both. Are there lesser other harms, or is there per se harm from failure to get a prescription? Tell us more about that. Thank you, Judge. I will, and I'll move over to the irreparable harm point now on the assumption that we do need to show it. I will add before I move on that the suggestion that the defendants would continue to act in violation of the law, even if the protocol were held unlawful and set aside, to us is both surprising and slightly disturbing. But moving on to having to show irreparable harm, the district court got it wrong in assessing the evidence there, because it placed much too much weight on the per curiam decision in Barr v. Lee. Now, that decision was decided in the context of a preliminary injunction, a last-minute request to stay in execution. And the court there held that in light of the competing evidence from the parties, the plaintiffs had not shown a substantial likelihood of success on the constitutional claim. And you know from looking at the opinion that the Supreme Court went to length in a backdrop section to show all of the reasons why it is, in the court's words, an exceedingly high bar to meet on the merits of a constitutional cruel and unusual punishment claim. But here, we're in a different posture, and we're dealing with a different claim and a different analysis. The defendant has been found to be acting in violation of the FDCA. Now, assuming we have to show irreparable harm, the irreparable harm that we showed and that the district court misconstrued is that by not complying with the FDCA's prophylactic safeguards, and those are there specifically, the court in Beatty held, to ensure that lethal injection drugs are administered humanely and to minimize the risks of pain and suffering. By failing to comply with those safeguards, the plaintiffs here have been exposed to a risk of severe bodily harm. And it doesn't take a lot of digging to see where the district court's erroneous view of Lee infected the assessment of the evidence and the analysis here. First, you can look when the court assessed plaintiff's evidence, which was extensive on the point of harm, it held that even if plaintiff's evidence might prove that pulmonary edema occurs in a prisoner while still conscious, that still would not be enough because the Supreme Court ruled in Lee that pentobarbital is not likely to cause an unconstitutional level of pain. In other words, in the court's view, there's no amount of evidence of pain that would be enough to show irreparable harm here. But that's not the likely standard, and we're not dealing with a constitutional level of pain. We're simply talking about irreparable harm arising from and relating to descendant's continuing violations. But more importantly, the Supreme Court never said that. It simply held that the competing evidence before it, again, in the context of a last-minute request to stay in execution, was insufficient to show a substantial likelihood of success on the constitutional claim. So one of the harms you're pointing to in support of the FDCA claim is a sub-Eighth Amendment level of bodily harm potentially resulting from flash pulmonary edema. And my question is, is there any other harm that you're relying on? It struck me that if Bureau of Prisons officials were to make a determination that they were going to administer non-lethal drugs to non-death sentence prisoners without complying with the FDCA, those prisoners sought to enjoin that conduct, they would likely be able to show, I mean, that would sound in irreparable harm. And I wonder if you agree or if you think there's some other harm other than the flash pulmonary edema that I understand has been the focus of the record and both of the claims in this case on which you're relying for injunctive relief just on the food, drug, and cosmetic claims. Thank you, Your Honor. I do agree with the hypothetical and think it applies squarely here. The harm is slightly different, I would frame it, than how it was just articulated by Your Honor. And to articulate it, you have to look at what the purpose of the FDCA is to begin with. It is a prophylactic statute that is meant to provide safeguards in the administration of drugs so that there is no unnecessary pain and suffering involved in that administration. And that holds true even in the lethal injection context. So here, by evading their statutory obligations under the FDCA, the defendants have exposed the plaintiffs to a severe risk of unnecessary pain and suffering in the context of their executions. And so while the irreparable harm, of course, can be the flash pulmonary edema, it is that increased exposure to that risk of severe bodily harm. And we put in the evidence on the record that there is very, very strong evidence that this pulmonary edema is severe bodily harm. It's a virtual medical certainty and it creates the sensation of burning, suffocating, drowning in those in which it manifests while they are conscious. Can I just ask, I'm missing a step here, I think, in my mind. How does having a prescription written for dependent barbershop address that injury? Your assumption seems to be that it will be written by a doctor who will say you can only use this if you first use an analgesic. But as we know, there are doctors who, the government has its own witnesses, there are doctors who don't believe an analgesic is necessary. And so if they have a doctor who writes a prescription for dependent barbershop and nothing else, nothing has happened. I'm just not understanding how the prescription addresses the injury you're talking about. Sure, Your Honor. So it's beyond just an extra prescription for an analgesic or an opioid pre-dose. What the FDCA mandates and brings with it is the requirement that defendants seek out professional medical consultation, which would bring with it informed clinical judgments based on the most current science to ensure that the executions are administered in a way that mitigates risks of severe pain and suffering. Now, one result of that may be that a precaution is taken like a pre-dose injection of an opioid. But what it is is more than that. It is a process by which a medical assessment is made as to whether or not a particular execution is being done in a humane way. Now, the district court, we submit, failed to grapple with this point. How does the FDCA get to humane ways of execution? It gets to safe and effective and clinical supervision. But I don't know that the FDCA gets to a doctor enforcing humane execution standards. I don't know that that's the same as safe and effective. Well, I think the two are coextensive in these circumstances. So, you know, the court in Beatty, which this court affirmed in part, it showed, it talked about this, and it said that what the FDCA ensures is that the drugs work for their intended purpose, and they work in a way that doesn't add to the risk of severe bodily harm. So in this case, it's not simply the goal to execute people. The goal, even defendants will agree, is to execute them in a way that doesn't add unnecessary pain and suffering. And looking at flash pulmonary edema, the evidence here is that it is extensive. That's your evidence. I mean, they clearly have their, they have competing evidence. And so if they get a prescription from one of their experts or just a Bureau of Prisons doctor, and it says just pentobarbital, they will have complied with the FDCA, and your claim will be over. Well, there's been, Your Honor, there's been no evidence that the defendants have ever done that. They don't seem willing to. That remedy does not redress in any way the injury that you're asserting here. That's the gap that I'm missing. I think the injury is redressed, again, whether or not a pre-dose is prescribed at the end of the day. The point is the protection, the safeguard that's in place by the FDCA as a prophylactic statute is that medical process and assessment as to whether it's necessary or not. So we can speculate and government can speculate. But that hasn't been the way you've been framing it. Like, to me, I'm just not sure why the harm from the FDCA violation here is different from the harm from non-sentenced inmates who would want to get an injunction against not prescription beta blockers or insulin or, you know, what have you. But you do keep going back to the flash pulmonary edema. And, you know, you're right that the government will concede that they want to achieve humane execution. But they also argue that the constitution doesn't guarantee a painless death. And so it's just struggling here to distinguish the threshold for injunction. And maybe it's unfair because we should also ask Mr. Meltzer some questions. But the threshold for injunction under the FDCA and how it really differs from the threshold under the constitution. Yes, Your Honor. In the constitutional level of pain, of course, the constitution tolerates some level of pain. The standard is whether there's a supervision of pain on top of what is tolerable and it's unnecessary. But here in the context of irreparable harm for an FDCA violation, the district court itself recognized the possibility, even at the end of the day, that there's a possibility that these prisoners will suffer excruciating deaths. And so what the FDCA does is it puts in place those safeguards around the administration of pentobarbital that ensures that there is medical, trained medical and clinical look at these executions before they happen each time to see if something is needed to reduce the risk of that severe and unnecessary bodily pain. Removing those safeguards alone is the irreparable harm here because you're putting these plaintiffs at risk without any of that clinical oversight. Let me just add to that. Oh, go ahead. Oh, yeah. My question is maybe even prior to some of these points, which is, you know, I think some of this discussion highlights some of the difficulty of applying the FDCA at all to a drug that is being used for execution. And, you know, I just wonder how we can read the FDCA to also apply the drugs being used in this context when you look at the text of the statute and the Supreme Court's analysis in Brown v. Williamson. Thank you, Judge Rao. So this court has already ruled on the issue twice that lethal injection drugs like pentobarbital are subject to the FDCA. Well, in the Cook case, the FDA conceded that the FDCA applied. So there wasn't really a full, you know, analysis on that question. Well, the court did look in Beatty below at the issue and assessed it as the drug at issue there, sodium thiopental, was a drug that was already regulated by the FDCA, and it doesn't lose its status or its definition as a drug depending on its intended use. So a drug is a drug is a drug, and although it's used in the lethal injection context, it remains subject to the FDCA, and the policies, the core principles behind the FDCA continue to apply even in the lethal injection context. I think that's what distinguishes this case from the Brown and Williamson case. As Beatty recognized, even though you are using a lethal injection drug or a barbiturate as a lethal injection drug to bring about death, the policies behind the FDCA still come into bear to ensure that the drug is used as intended to ensure or to mitigate the risk of an inhumane death. And the court there analyzed this and said when a lethal injection drug isn't used properly, it doesn't function as intended, there is a risk that prisoners executed by it will suffer pain, will suffocate, and will unnecessarily experience pain. And so the policy behind the FDCA still applies even in the lethal injection context. We think that was a necessary predicate to then the Cook decision, which of course was, as your Honor points out, somewhat assumed. But this court in a panel just last July, that of course included Judge Pillard, followed Cook in denying the defendant's motion to vacate the district court's preliminary injunction order, which was issued based on the district court's ruling that defendant's use of pentobarbital was likely violating the FDCA. And in doing so, the court relied on Cook and said that the defendant's position here conflicts with the necessary premise of Cook. We think that is justifiable. And then the Supreme Court overturned that day in July without any further explanation. It did, Your Honor. There was no reasoning in the order. No one knows exactly what the Supreme Court meant by that. The district court has declined the invitation to speculate as to what the Supreme Court meant by that. And we agree with that approach. Let me ask you about your eighth inclination, just briefly. Putting aside the preliminary injunction or permanent injunction question, I take you to be arguing that at a minimum because even though preliminary injunction really was denied, that the plaintiff's case will be fixed on stage and that plaintiffs are entitled to have a factual determination whether by cross motions for summary judgment or by a trial of the question that they've raised about flash pulmonary edema. Is that right? That's correct, Your Honor. The posture is critical here. The posture is critical, but the evidence, I mean, there was a lot of evidence put in on the preliminary injunction stage. And I guess the question is, is there, and you have referred, I think, to Rule 52 and saying that the district court should have made facts. Are we, for all intents and purposes, actually at kind of a Rule 52 stage? I mean, has the district court already made a finding that, you know, based on the evidence that is the very same that would be made under Rule 56? Or is there more evidence that the plaintiffs would proffer or some procedural difference that it would make? So there are two answers, Your Honor. One, the Supreme Court's decision in Barr was a preliminary ruling. It was not a final adjudication on the merits. And of course, courts, even when they say that one party may not have met the substantial likelihood of success prong at the preliminary stage, have sometimes ruled that parties win on the merits down the road in a different procedural posture and involving different evidence. And the second point is the evidence continues to evolve. To answer Your Honor's question directly, the evidence has continued to evolve since Barr v. Lee. There have been more executions. And with every execution that occurs, we get more evidence that pentobarbital, without any precautions put in place, is causing prisoners to feel the effects of flash pulmonary edema while still conscious. Can I clarify, have you got more evidence since the district court's ruling in September that the evidence does not show that they are likely to suffer because they're not likely to still be conscious? No, not more since then, Your Honor. But that's sort of one of the errors that we think the district court made here is that the district court looked at the new evidence. This was evidence from the execution of LaCroix and said, even if that is proof that this prisoner suffered flash pulmonary edema while still conscious, that's not enough, given what the Supreme Court held in Barr v. Lee. And we think that is totally wrong because what, in essence, the court is saying is that no matter how many— The next paragraph is when she starts talking about the Supreme Court. So what I'm wondering is, if you don't—is the point that you would get more evidence if you went past the pleading stage, or that you have more evidence, or is the evidence going to be the same and it all turns on her separate—her next paragraph adding on the Supreme Court point? And, Your Honor, I assume that you were reading from the record at 133, page 7 of the district court's order. I'm on page 39 of the September order. I see. In the November 3rd order, this is at 133 of the record. Okay. The district court said, even assuming plaintiff's new evidence— I'm sorry, which page are you on here? Sure, it's Joint Appendix 133. Sorry. What page of her opinion? Do you have that, the original opinion? It is page 7 of the opinion in order document. Okay, thank you. Sorry. At the top of page 7, it says, and I'm quoting, Even assuming plaintiff's new evidence establishes that LaCroix suffered the effects of flash pulmonary edema while still conscious, such evidence only confirms that the onset of flash pulmonary edema is possible upon the administration of pentobarbital. And then it goes on to explain that what the plaintiffs need to do here is supply evidence that casts doubt on more than 100 executions that have happened in the past. And she grounds that ruling in her reading of Barr v. Lee. We think that was a fundamental error. And so what she's saying is, we have new executions that come out, and they show, and they constitute proof that someone is suffering from flash pulmonary edema while still conscious. In her view, she believes the Supreme Court foreclosed that evidence for now and for all time. I'm asking a much more pedestrian question, and that is, would you have more? Do you have more? Would you have more? Your point is taken, but if you've given everything you have, and she's already said that's not enough, even apart from the Supreme Court ruling. She said it in September. That's why I'm asking, is there something since the September hearing, or the September decision, the hearing that led to that? I can't keep track. If there's been additional executions with evidence, or you've gathered other experts, or there's other evidence that you have, or you think you would obtain by going forward with a case like you would if this was a normal constitutional litigation that wasn't caught up in the up-and-down-and-stays-and-death penalty cases. Or for cross-examination, even. I think we would do a few things. We would certainly continue to gather more evidence from executions to continue to bolster our understanding that gets more precise and more certain with every execution that this is a problem. We would also cross-examine. We would depose the experts that have been put up against us. We've never had the opportunity to get them in a deposition like that. There has been some cross-examination, but it's a couple of hours of a string over a weekend in an expedited fashion. We would want that evidence as well. Have there been more state executions using just sent the barbital this fall? I don't know the answer to that. I can try to find it out for you before the end of this argument. I just didn't know if that was another source you were following. Another symptom of the problem, beyond saying that we needed to show evidence that cast a doubt on more than 100 executions carried out with pent-up barbital, was that the district court also, despite recognizing some serious flaws in defendants to experts, faulted the plaintiffs for failing to completely undermine them. Again, we think that that reflects the skewed view that the district court had as to its fact-finding here and what evidence was necessary to show irreparable harm, again, in the context of the FDCA claims. Okay, thank you. I think we have some other folks that want to talk. Do my colleagues have more questions at this point? We'll give you some time on the bottle. Thank you, Your Honor. Colleagues have more questions? Okay, fine. I'm sorry, did you have a question? No, I did not. Thank you. Thanks. All right, Mr. Meltzer, I think you're to talk about the stay motion. Is that correct? Good afternoon, Your Honors. Jonathan Meltzer. I represent Brandon Bernard, and I'm speaking on behalf of Mr. Bernard and Orlando Hall. I would just like to, you know, rest on Mr. Driluski's discussion of the merits of the case, and I want to make one brief point about the stay standard made by the government, and then I will certainly address any questions that the court may have. The government suggests in footnote three of its opposition to the stay motion that the movements need to make a clear and indisputable showing of a right to relief in order to receive a stay in this case, and that is just not consistent with how the Supreme Court has treated challenges to lethal injection protocols in situations just like this one. In three recent cases, in Bucklew, in Glossop, and in Bays, all in the last 12 years, petitioners brought civil suits just like this one challenging a lethal injection protocol, and in each case, the Supreme Court granted a stay pending its disposition of the petitions for certiorari, and in none of those cases did the Supreme Court suggest that any higher showing was necessary, nor would it have made sense in those cases because ultimately in all three, the petitioners lost on the merits of those cases, and so if petitioners had been required at the outset to make a clear and indisputable showing of a right to relief, the Supreme Court would have been in error in granting all three of those stays. It obviously did grant those stays, and ultimately it did not rule for petitioners, but what that shows is that they were applying a typical stay standard from NKEN and not the standard that the government suggests here, so what the government is in fact asking for here is a departure from standard Supreme Court practice on this type of stay motion, and we don't think that that's warranted. Does my colleague have any questions? I wonder if you could address the question that I was also asking of your colleague of what, if any, difference you think there is between the kind of showing of irreparable injury that might support an injunction on the FDCA cestiorari claim that's distinct from the constitutional claim. You know, we believe that, as Mr. Jalewski said, the showing of irreparable harm, or the risk of harm that we would need to make here is just a slightly lower standard compared to the Eighth Amendment standard, and we would suggest that essentially here, you know, the BOP has put forward experts, paid experts, that have said that a sedative isn't necessary, but we would argue that an objective clinician would apply medical judgments on a clean slate, and given the risk of harm and the lack of any downside of giving the sedative, there's every reason to think that a sedative would be prescribed here, and so for that reason, we think. Is there something in the FDCA that counts on which doctors they have to go to to get this prescription? No, Your Honor, and certainly we would expect them to go to a doctor who would provide independent medical judgment on what is necessary, and we think in that circumstance. If they went to one of the BOP doctors, the BOP, your prison doctor, covering the facility where your clients are, or where they're going to be executed, and that doctor issued a prescription, your FDCA claim would go away as long as there's a prescription? Well, what we think, as Mr. Jarlouski said, what we believe is that that doctor would, you know, what we are entitled to is a doctor weighing whether or not a prescription for pentobarbital should be given in these circumstances and under what circumstances it would be given, whether the doctor would also prescribe a sedative along with it, and so if ultimately the BOP position that you've hypothesized were to give that prescription without providing a sedative pursuant and lawfully under the FDCA, we think that is what we are due, but we certainly believe that a medical doctor using independent judgment might well give that sedative, and we think that's precisely what we are entitled to here. I guess I'm having this confusion that I had about the framing of this claim that I discussed with Mr. Jarlouski, which is, you know, if I were an inmate with a heart condition and I needed prescription, I don't know what people get injected, and it had been routinely given to me by prescription, and then the prison said, we're just going to get this, you know, batch from a founding pharmacy and we're going to have our nurses give it to you without prescription because of the drill. I wouldn't have to show any risk of flash pulmonary edema to get an assumption against that determined policy by the Bureau of Prisons, but I don't take that as your argument, and I'm sure that Ms. Patterson will tell me why that's an inadequate basis for assumption, but it's not entirely apparent to me. No, and you're right. I'm sorry, before you answer, Mr. Jarlouski, I apologize. I'm getting a lot of feedback. I don't know if other people are. I know that Ms. Patterson is not muted. I don't know if that's part of the issue or not. It looks like she's in a nice quiet place. Yeah, I know. I'm not sure what else is going on. I'm just trying to see if I can hear. Judge, Ms. Patterson is muted. She has a phone connection. Okay. I'm just trying to figure out what's causing all the feedback. I apologize. Your Honor, I apologize. No, no, I apologize. It may be coming from me. I hope not, but it's certainly possible that I'm a source of feedback, but in any event, no, Judge Pillard, your question is certainly, you know, as with you, I am interested to hear what Ms. Patterson has to say in answer to that question. I certainly think that, you know, the BOP is required under other circumstances to get a prescription for medication that is provided to prisoners. And so, you know, we certainly, you know, we believe that we have pointed what the harm is here of an SBCA violation of not allowing our, not allowing a medical doctor to determine the circumstances under which pentobarbital would be prescribed to our clients. But, you know, there's obviously a more foundational question that you're asking here that we don't disagree with. And that, I mean, that would be satisfied by a BOP doctor who might be quite conscious of it, but it would, but that's the statutory obligation, is it not? That's exactly right. We, you know, we certainly have a view of what we think that a BOP physician would do, but the obligation is for a BOP decision to make that independent judgment about what is required, and we believe that's the statutory obligation and it should be carried out here. Jess, if I wanted an instant bump at the BOP doctor prescribing the insulin, we're going to continue with your daily injections. That would comply with the FDCA, even if the policy I'm hypothesizing which does away with it. That's exactly right. Are there any other questions? All right. Thank you very much, Mr. Nelson. We'll hear from the government now. Thank you. I believe I've unmuted myself, but if you can't hear me, please let me know. I do want to note, I can't see Judge Rao. I don't know if there was an announcement I missed at the beginning, but I can see Judges Millett and Pillar, but not Judge Rao. She is present, and she is only on audio. Okay. Thank you very much. I apologize for causing feedback, if I did it wrong. Pardon? I apologize for occasionally causing feedback. That's okay, Your Honor. You know, I'd like to start with the FDCA, and I'd like to first make the point that the Supreme Court's vacater of the first FDCA-based injunction in this case, in Perkey, it was unexplained, but there are essentially two possibilities for the court's vacater. Either agree with the government on the merits that the FDCA simply does not apply to drugs intended for use in lethal injection, or consider the equities to warrant vacating the injunction that was entered. In either way, we think that that decision underscores the impropriety of reversing the district court's decision and deciding that an injunction based on any asserted FDCA violation is warranted here. Now, as Judge Rao referred to, there's sort of a threshold question before we even get to the existence of injunctive relief, and, in fact, there are two threshold questions. That's first, whether the FDCA applies at all to lethal injection drugs, and second, whether or not this type of APA suit can be brought to restrain violations of the FDCA. So I'd like to start actually with the second point and to turn the court's attention to 21 U.S.C. 337, which says that actions to enforce the provisions of or to restrain violations of the FDCA shall be in the name of the United States. Subsection B goes on to provide a very narrow carve-out to that United States-only rule for states in very specific circumstances, and we think that this is the sort of express congressional indicia of a statute that precludes resort to the APA's default cause of action. You know, in cases like block C community nutrition, the court said, we need to examine whether the particular class of plaintiffs who are attempting to use the APA to say something is wrong with a scheme, we need to see if Congress wanted that particular class of persons to be able to sue. And there, of course, it was implicit. The court found that in the, I believe, the milk marketing scheme, because Congress had so carefully specified who could sue and who couldn't, the consumers who wanted to use the APA's cause of action there were out of luck. Now here... Was anybody allowed to sue there other than the government? Were there other private entities? Yes, there were other private entities who were allowed. But here we think in 337, the Supreme Court has very, I'm sorry, Congress has very clearly identified who can enforce the FDCA, and it is the federal government, or in very narrow exceptions, the state government. Are you aware of a situation where, I mean, the point of the APA is that it allows individuals to enforce, force the government to comply with law, which obviously isn't going to happen when the government's enforcing things. And so are you aware of a case where there was no alternative mechanism for private enforcement, or other affected individuals, I mean, not necessarily private, where affected individuals were barred from suing under the APA for the federal government's noncompliance with the statute, when the statute, similarly to here, envisions federal enforcement against other people? That's clearly not against itself. Your Honor, I think most federal criminal violations work that way. It's not, you know, absent, you know, some sort of cheap hand suit under the False Claims Act. Generally, the public does not get to go and enforce federal criminal law, even if it thinks federal officials or federal agencies are violating that law. I think where Congress has reserved enforcement authority to the government, that is the type of preclusion under 701 of the APA that means that Congress has put to the side. And moreover, in Heckler v. Cheney, the Supreme Court found that the very enforcement provisions of the FDCA here at issue, recall this is not the 381 that was at issue in Cook. These are the underlying enforcement provisions. Well, they're not trying to sue to have you enforce the statute against somebody else. They're trying to sue to have you comply with the statute for people who are in your custody, who cannot stand for themselves. Now, your theory, thinking of Judge Pillard's hypothetical, the federal government said just to have less paperwork, all drugs administered to BOP prisoners will be issued without prescriptions, without the superintendence of a doctor that's enforced through the prescription process under the FDCA. And your position is nothing to be done about that unless the government sues itself? I think there might be other forms of suits available. What? I don't know specifically because I know that there are statutes governing the ways in which prisoners can bring suits. But I do not think that... No, no, but I'm talking about what the cause of action would be. And, yes, there's a PLRA, but that's procedural. Is there another, is your position here that they sued under the wrong statute? Is that what you're telling me? No, Your Honor. My position is that I don't know what other statutes might provide recourse or what limits Congress may have provided on such recourse. You're not aware of any other statute that would let them sue for the hypothetical? I'm borrowing Judge Pillard's here. I'm not, but I'm not saying that one doesn't exist. I'm saying I simply don't know, and I don't want to give the court an incorrect answer. But I think at crux, they could not use the FDCA to try, or the APA, to use the FDCA to restrain an FDCA violation. I would have thought that if there was another statute they should have used here that the government would have discovered that by now. I can't even conceive. I don't know of every statute in the book, but I see a lot of them, and I can't conceive of what that other statute would be to make the government comply with the law. I'm not sure, and I just don't want to get out ahead because this has not been... Let's assume there's not another statute. Well, I'm wondering about the availability of Bivens liability. I do not know, Your Honor, and I don't want to spitball and give the court an incorrect answer. We can look into this. I guess I'm pretty sure, given the government's position on non-expansion of Bivens, that it's not going to invite an expansion to the statutory enforcement. In fact, I'm pretty sure Bivens law is clear that if there's an alternative enforcement scheme, you use that rather than implying a Bivens action. But I think that my point is that even in Judge Keller's example, that if what you are trying to do is restrain a violation of the FDCA, that 337 reserves that to the government. And I am not opining on what other recourse may or may not be available or what other form it may take, but I do not think it could take the form of an APA suit saying you're violating the FDCA. Now, I do want to turn to the actual basis on which the district court rules here because, of course, the only things that have happened since August 27th, when this court vacated an FDCA-based injunction for failure to make factual findings on irreparable harm, are that the district court decided that the evidence reasonable minds could differ. It held an evidentiary hearing to assess witness credibility. It listened to those witnesses, and then it issued factual findings that plaintiffs had not carried their burden of establishing the only irreparable harm they pointed to here, which is the risk of pulmonary edema while sensing. Now, there were two findings in their independent basis for the court's refusal to enter the requested injunction. The first is one that I believe Judge Pillard referred to earlier, and that is the disconnect between the asserted statutory violation, the lack of a prescription under the FDCA, and the relief that they are seeking. Pentabarbital's effects do not vary based on whether or not they are accompanied by a prescription, and I think plaintiffs will misunderstand the FDCA and ignore the entire lack of evidence in the record when they suggest that the FDCA would somehow get them to a doctor prescribing a second drug. The FDCA does not require doctors to pair a prescription with pentabarbital that's been compounded with any other drug or analgesic or opioid. There is sort of speculation about what doctors who take their view of what pulmonary edema does, there is nothing in the record to support the speculation about what doctors would do or wouldn't do, and so just getting them a remedy for the violation they say exists, just getting them a prescription, if that were possible, and the government does not think it is, does not remedy the only harm they've identified. They are looking to use the installation button and follow the instructions. I don't know what that is. I think I got some noise. I think that this underscores the degree to which they're trying to use the FDCA to reform execution protocols in a way that is far beyond anything the FDCA contemplates or dictates. Let me ask you a slightly different question, although it picks up from your discussion of the September ruling, the hearing, and the ruling. On the Eighth Amendment, this is stepping away for a minute from the question about injunctive relief and just talking about the factual dispute that the district court identified in the record and then said it's not a basis of irreparable harm. What's your view about whether and when it has been or will be fully resolved? Has it already been resolved in terms of, you know, she said there's conflicting evidence of whether pentobarbital renders somebody insensate before it causes any kind of flash pulmonary edema. The government's witnesses say it doesn't happen. And the plaintiff's witness says, yes, it does. And I didn't take the district judge to have resolved that, but rather to say, at least with respect to the Eighth Amendment claim, it doesn't rise to the level of cruel and unusual. Is it your position that it has been resolved, that it doesn't need to be resolved because it's legally irrelevant, that it would ordinarily proceed to summary judgment and or trial, but we don't need that here because we've effectively had that trial? It's a little unclear to me, given both the march of the emergency motions and the progress of the underlying case, what the government's position is about that question. So just to clarify the timeline here, at Docket 193, back in August, the district court granted the government's motion to dismiss the Eighth Amendment claims with respect to all plaintiffs except one, and I believe there are now two, who have individualized claims that are still being litigated in district court. The findings on the FDCA post-date the dismissal of the Eighth Amendment claims. So when the district court was weighing the evidence that the parties had put before her and trying to decide whether the plaintiffs had carried their burden of establishing that it was likely that they would actually experience the only harms they pointed to, the court was only considering that in the context of an FDCA violation. Now, we think that the court properly looked to the Supreme Court's decision and lead not to resolve any factual questions. You know, the district court has just gone through and explained sort of in a blow-by-blow way what the evidence in the record was and who she sort of thought had or hadn't undermined who, and she finds repeatedly that the plaintiffs, under the standard they put forward, the likelihood standard, had not carried their burden. And then the district court says that it's looking to Lee to decide sort of when it is appropriate, what warrants injunctive release. And we think the district court appropriately looked to the cues about when to use that equitable discretion, given that in Lee itself, the Supreme Court had before it the district court's sort of preliminary assessment of the evidence before she heard from the witnesses, before she had any, or I'm sorry, before it had any evidence from Dr. Crowns, the government expert on which the court primarily pointed to. At that point, the court thought it was a virtual medical certainty that these harms would occur, and yet the court did not think injunctive release was appropriate. And I want to negate any idea that this was because of a last-minute request by the plaintiff. That request had actually been pending for weeks. It was because of last-minute action by the district court, and by last minute, the court vacated the injunction, even as to an execution that was six weeks, longer than either Mr. Hall or Mr. Bernard's execution here. That is the type of last-minute intervention that the court has said is inappropriate, even in the face of then the district court's assessment that it was a virtual medical certainty that plaintiffs would experience pulmonary edema. Now, the only thing that's happened since then is the district court held a hearing and concluded that they hadn't made their case. And so the idea that injunctive release, I'm sorry, Judge Keller, you're trying to get in. Finish your text. The only things that have happened since the Supreme Court and this court have repeatedly made clear that injunctive release, halting federal execution, the only thing that's happened is they got adverse factual findings, and they've gotten more process. We think that there is no basis, even on any of the claims in the appeal, for this court to direct either to enter an injunction pending appeal, or to direct the district court to enter the injunction that plaintiffs seek. At most, even if they're right that there was some sort of error in fact in the fact-finding process, at most that would leave this court with an absence of factual findings, which is exactly where it was on August 27th when it vacated an FDCA injunction for lack of factual findings. I'm sorry, Judge Keller. In August, the district court basically took the Supreme Court's denial or vacature of preliminary injunctive release and then said it would thus seem contrary to leave for this court to enter judgment on those facts and find an Eighth Amendment violation. And so what I understand the plaintiff to be saying here is that is taking a preliminary injunction holding to be determinative on the merit. And that does not seem correct to them. And your response to that is? Well, I want to distinguish. There were two Supreme Court vacators of two different preliminary injunctions. The August determination where the district court says that she is looking at what the Supreme Court did in holding that the plaintiffs were not likely to succeed in leave. And then she says, given what the Supreme Court did in leave, it would seem contrary to that for this court, the district court, to enter judgment on those facts. That's the Eighth Amendment claim, Your Honor. On the FDCA, what the district court did. Matthew, about that. Because I think that, I mean, they have currently on the appeal challenges to both of those holdings. And I think that as I take it, their challenge to the Eighth Amendment holding is basically the district court said, oh, you didn't get a preliminary injunction. You lose your case. And their position is, well, people fail to get preliminary injunctions and win their cases sometimes. When do we get our, that's why I, when do we get our, you know, determination whether on cross motions for semi-judgment or the factual trial? Which is why I was asking you, when do you think that happens? Or do you think that already happened? I do not think that already happened. The hearing that was held was on the FDCA after the Eighth Amendment claims had been dismissed. But I do not think they get that. And that is because what Lee reiterated and why we think the court appropriately looked to Lee was that the Eighth Amendment poses an exceedingly high bar. And under Bucklew, the Supreme Court's latest, you know, fullest treatment of the Eighth Amendment, we think the type of pain that they have alleged here, even if true. And I do want to make extremely clear that the government does not think that these inmates will experience pulmonary edema while sentencing. And that is backed by expert testimony. And that's your position, absolutely. But so I think what you're saying is that this factual issue doesn't need to be resolved because it's legally irrelevant. Because even assuming that the district court were to credit all the medical evidence that the plaintiffs have proffered in this case, it is just not that, what they've identified is not cognizable in your view under the Eighth Amendment. That's right, Your Honor. And we think that's why the district court's judgment dismissing at a 12B6 stage was proper. We think that they simply did not put forward enough. Moreover, we think that they did not, they failed to plead a known available alternative that significantly reduces any pain experienced attendant to death that the government has or lacks a legitimate penological reason for not adopting. They pointed to only two. They pointed to a two-drug regime, an opioid plus the pentobarbital. And they pointed to the firing squad. There is not a single government that uses the two-drug regime that they want. And that is, as a matter of law, as the Supreme Court has made clear, a legitimate penological reason not to use it. A state never has to, or a state or the federal government never has to be the first to test run an untried protocol. Every court to consider the... I just wanted to go back to, sorry, I had the question about the determination on the Eighth Amendment claim, which was the August determination. And it's been very helpful. You've clarified for me that, indeed, it's a matter of law ruling that you take her to have made. So even looking at the pleadings, she's saying, as a matter of law, if everything you're pleading is true, I can't allow that claim to proceed because it doesn't plead something that would constitute a matter of execution, Eighth Amendment violation. That's correct, Your Honor. And the district court was clear that it was crediting, you said, you know, sort of even crediting all of their evidence, this isn't enough. And we think that that was the correct application of Eighth Amendment law. Although, this is part of what I'm having trouble with, and maybe I'm being overly formalistic as, you know, as to civil procedure. But the evidence was in for a preliminary injunction, and then the underlying case was at the pleading stage. So the question is not really whether she credits her evidence, but whether she credits their allegations, and whether they could state a claim, a matter of execution claim, and a non-frivolous claim. And is your position that the claim is, given the proceedings at the preliminary injunction stage, the claim is, in effect, frivolous? Not that it's frivolous. Not every claim that fails to meet a 12B6 standard is frivolous, Your Honor. But, you know, there's a great deal of space between frivolity and, you know, fails to state a claim, and fails to state a claim that could possibly get relief under the Iqbal standard. And we think the court was correct that this just did not state a claim. It wasn't enough. Okay. And on the FDCA claim, I think their position is, so then a month later, or at least the next month, she… Can we stay on the Eighth Amendment for a minute? Oh, yes, absolutely. On the Eighth Amendment, there's sort of a severity issue for pain, right? That's what I thought the district court was saying. And whatever this pain is, it doesn't add up to something that violates the Eighth Amendment because the Eighth Amendment has a very high standard for pain. Is that how you understood it? Yeah. Sorry, I'm going to… I'm having a little trouble hearing, but I think I agree that the district court properly recognized that the extent of pain alleged in the complaint did not meet the Eighth Amendment's high bar. Does gratuitous pain violate the Eighth Amendment, even if it's not a high bar? The Supreme Court has sort of reserved the issue of whether or not there's sort of an intent requirement. It's certainly that, you know, a state is somehow intending to add pain. The court has talked about super added pain terror disgrace. And so if that's what you mean by gratuitous, sort of the state is either intentionally or negligently adding pain terror disgrace to a means of effectuating death, then that is what the Eighth Amendment is aimed at. And of course… Right. So if there was pain, maybe it wouldn't be worse than hanging pain. The Supreme Court talks about that sometimes. But it's not necessary to carry out the execution. It could be easily avoided. Or it's just an add-on. They don't need to do it anyway, but they choose to. So it's gratuitous. I'm not talking about the drug protocols and drugs no longer being made. I'm just talking about, you know, they say we're looking for a vein. We're looking for a vein to put the drug into. And they're going to stab around for a vein for five minutes, and then we will insert it. All right. That's not super severe, terrible pain. But it's not necessary. You can get a phlebotomist that can stick it in a vein, the right vein the first time. You don't need to stab the guy in the arm for five minutes before you put the needle in the vein. So it's just super add-on pain. That would violate the Eighth Amendment or not? I don't know, Your Honor. The Eighth Amendment has a very high bar. But I want to note that there are no allegations… What I'm asking is, does it have a high bar for gratuitous pain? What if they punched him in the stomach to make him lay down? Let's make sure, Your Honor… We don't have to wrestle him. We're just going to punch him in the stomach, and then they always lay right back down. Your Honor, I think that that type of super added pain could be on a different footing. And there are no allegations that the government is somehow super adding pain here. The allegation is that the method is inherently… I think it's a question of understanding. I'm not sure they would agree. I think they would say… If I understand their argument, it's that it is wholly unnecessary. Now, I know you have experts. I'm not asking about that. I'm just trying to understand the legal test here. It's wholly unnecessary to make people suffer with flash pulmonary edema, even if you're right that it's not… It's bad, but it's not so bad that it violates the Eighth Amendment in its own right. But it's wholly unnecessary. Just give them a shot of morphine or something beforehand, and it'll be gone. Something you have in the infirmary dispensary already. You know, there's chemo patients there. You have strong painkillers in your infirmary. All right, give them a shot of that, and we will avoid this pain altogether. I think by that logic, there would have been an Eighth Amendment violation in Glossop and Bucklew and any other case involving hanging, electrocution, or firing squad. No, I don't think that's just not true for hanging because there's nothing else you can do. Right? Hanging was how they did it there. They didn't have the pharmacological options that we do now. It's a different time. And so the question is, simply, is gratuitous pain, even if it's not, more painful than hanging? It's not at that level. It's painful, but it's wholly unnecessary. Does that violate the Eighth Amendment or not? I don't think I disagree with how you're defining wholly unnecessary, Your Honor. I'm sorry. I think it was a glitch here. I couldn't hear a few say… I disagree with how you're characterizing wholly unnecessary, and I think by this line of logic, the… I'm not saying it's wholly unnecessary. This is my question. All right? My question is, my hypothetical is, it's a wholly unnecessary pain. You know, a punch in the stomach because then you never have to worry about wrestling them down on the table or stabbing around in the arm for five minutes before you put the needle in. It's wholly unnecessary pain. But it's not a type of severity of pain in the way it's felt. It wouldn't in its own right violate the Eighth Amendment if it were necessary. It's wholly unnecessary pain. Your Honor, I don't have… Does that violate the Eighth Amendment or not? I don't have an answer about what type of superadded pain-pair disgrace might qualify because, as the Supreme Court explained, there has never been a method imposed by any government in the United States that attempts to superadd pain-pair disgrace. There has been an earnest desire to move to ever more humane types of execution, and that is why the Supreme Court has never invalidated a single execution method. You don't have a position on whether superadded pain that's unnecessary to effectuate in the execution violates the Eighth Amendment. I think the Supreme Court has indicated that superadded pain can violate the Eighth Amendment. But if you're asking me to sort of give examples or quantify of what that type of superadded pain might look like, I can't because the Supreme Court has never identified any. You can for using someone else's hypothetical just like I did. I thought punching in the stomach was a safe hypothetical, but I guess not the government believes it could do that. I am not agreeing, and I am certainly not conceding that we would think that that is inappropriate or constitutional. I am not taking a position on that question, Your Honor, because that is so far… You're not agreeing that it's unconstitutional either. See, I'm taking no position, Your Honor. We are so far from any of the allegations in this case, and if there were some sort of constitutional principle that required us to affirmatively eliminate any of the sort of necessary pain that attends death, we would have seen very different results. And, in fact, the Supreme Court in Bays very clearly said judges should not become sort of boards of inquiry tinkering with execution protocols. That is not permissible under the Eighth Amendment. And, of course, you agree courts can get involved if we believe there's a violation of the Eighth Amendment. That's not a board of inquiry. And if a court was of the view that unnecessary, gratuitous pain violates the Eighth Amendment, your board of inquiry point wouldn't be relevant, right? It would, but I think the threshold… My point is about the threshold… Your Honor, my point is that the Supreme Court's language about a board of inquiry… Indicates that there is a very high bar before courts should get involved. I'm not saying that any time a court might take action to restrain a violation of the Eighth Amendment that that is a judicial board of inquiry. But I am saying that the Supreme Court has made clear that it is a high bar before courts get involved like that in changing the parameters of an execution method. And it is so far, so high, in fact, that the Supreme Court has never authorized it. Let me ask you back about the FDCA claim and the record. I asked you when we had an exchange about the Eighth Amendment and, you know, why it was that it was the government's position that the plaintiffs are not entitled to a factual determination on the merits on the harm relating to that claim. With respect to the FDCA claim, my understanding is that part of the plaintiff's appeal here is to argue that the district court erred in relying, in sort of interchanging the Eighth Amendment and the FDCA harm and that in the September opinion, she basically said, you know, where goes the Eighth Amendment, so goes the FDCA, whereas the threshold might be different and, you know, the harms that are material to a violation and to the entitlement to injunctive relief under the FDCA might be different. And that was a point that plaintiffs were arguing that she didn't appreciate. So I just wonder there, because it's not the same structure, you know, you've been saying that there is this sort of threshold of, you know, the non-painless but nonetheless not inhumane execution of the Eighth Amendment. That's not the inquiry under the FDCA. So is it not problematic that the district courts seem to be treating those, the cognizable harm under both of those as equivalent? I don't think that's what the district court did. I think that's very unfair to the district court's analysis. I'm looking at Socket 261. I'm looking at, this is around JA 120. We start there, page 36 of 261, and the district court goes through the evidence. The district court was not relying on Lee for any factual determination. The district court made its own factual determination. And in light of those factual determinations, this is a September opinion. This is September 20. You're on page. So I'm starting at page 36, JA 120. Right. And about halfway down, the court starts its analysis. It says the record contains conflicting evidence. And it runs through the different declarations from each of the sides, the competing evidence. It describes how the plaintiffs are relying on autopsy evidence. And then at the bottom of page 37, after considering the conflicting declarations, the court found that the question of whether an inmate will suffer a flash pulmonary edema before becoming insensate was one on which reasonable minds could differ. That's an intentional credibility assessment. It goes on to explain it held an evidentiary hearing. It explains why Dr. Cohn's testimony meant that the evidence plaintiffs relied on was not probative of the question. Dr. Cohn explained that autopsy evidence doesn't say anything about how quickly an inmate became insensate. And then at the bottom of page 38, recall that the claim here is that an inmate will be unresponsive, so will appear unconscious, but actually sort of nonvisibly be experiencing pain. And so the fight is when you actually become insensate. And so, you know, we had put in copious evidence showing that we thought that this claim, that somehow peripherals get to your lungs but not your brain, it would make you experience pulmonary edema without also rendering you unable to experience that, was simply wrong. And the district court concluded that they had not met their verdict. After that, the district court... Right. The difficulty I think the plaintiffs are identifying is that she, in ruling on the FDCA claim, she says, for example, in the denial of the reconsideration order on page 133, she says, as the court has already explained, given Supreme Court precedent, it's not enough to warrant injunctive relief, but there isn't Supreme Court precedent on the FDCA point. And so she's really averting here to 8th Amendment inquiry when what the plaintiffs here are talking about is FDCA relief. And the district court at 133 said that sort of the most recent autopsy evidence, which again, she had already explained in her prior order why Dr. Crown's explanation had not been undermined. But that type of autopsy evidence doesn't speak to the question of when an inmate became sensate. And I think you have to read them in light of each other. But the district court, when it transitions to talking about Lee, just as in the September order, is not talking about factual findings. It's talking about what warrants the exercise of equitable discretion, what warrants injunctive relief. The 8th Amendment, which might differ, right? Or is it your view that there is no... I mean, I know your view is that the FDCA doesn't apply and that it can't be enforced. But assuming it did apply and that an APA claim is available, which I understand that's not where you are, but just to help us out. If it's available, is it your view that in order to show, in order to be entitled to injunctive relief under the FDCA, one would have to plead and ultimately prove harm that would violate the 8th Amendment? I'm not sure I would put it that way, Your Honor. But I remember there are two remaining equitable factors. And I think that the balance of equities and the public interest. And here what plaintiffs are saying is that because of the failure of a prescription, they can grind to a halt all lethal injections in the country. And that, in fact, all lethal injections that have happened without a prescription, which is the vast majority of them, I think it's like a thousand, have been unlawful all along. And I think that as a matter of equitable factors and equitable discretion, it would be the tail wagging the dog to allow the FDCA to enter an injunction halting lethal injections where the 8th Amendment couldn't. I think that it is appropriate to look at the Supreme Court guidance about when injunctive relief is and is not available in the 8th Amendment context in exercising a court's equitable discretion, even assuming an FDCA violation. And I want to again point out that even if this court disagreed with how the district court made its factual findings, that leaves us where we were on August 27th. It does not warrant the entry of an injunction. So you did mention in terms of the balance of equity in your briefing, the principal equity that you talked about was delay and you referred to extensive litigation, long running litigation. But these plaintiffs on these claims only knew what protocol they would be executed under after this court handed down our decision in April of 2020 and they promptly filed suit. And the district court said, this is not Bucklew, this is not Glossop, this is a very different case where, yes, the convictions were long ago. But when you look at what's accounted for the time since then, is there a dilatoriness that you would point to on the part of either of the plaintiffs, for example, that Mr. Meltzer represents? Because I appreciate and I absolutely understand that the Supreme Court has said, you know, there is a public interest in prompt carrying out of a sentence of death. But I also think that nobody doubts there is also a public interest in legally compliant process, not just constitutionally compliant, but statutorily compliant process. So I guess the question is, where is the delay that's relevant for purposes of the weighing of the factors? I don't think that we have taxed delay overall in terms of bringing suit. In terms of Hall and Bernard, we do think that they could have gotten to this court faster. And given that their execution, Mr. Hall's execution had been scheduled and Mr. Bernard's co-defendant had already been executed, that deciding to file additional motions to reconsider may have deprived this court and Supreme Court of time to consider their claims. But more generally, I think that the Supreme Court has talked about not necessarily just delay on the part of an inmate, although that's certainly relevant, but also just the time it takes for states and the federal government to effectuate death sentences at all. I think that the Supreme Court has said that it is the duty of court, it has permitted method of execution challenges outside of the habeas context. And we have not disputed that they can bring, as long as they're not actually challenging their sentences, we have not disputed that they can bring the suit. But it needs to conclude expeditiously so that we don't end up in sort of a habeas redux where you're multiplying the entire stages of litigation. These plaintiffs have now had the benefit of, I think it is something like five injunctions, all of which have been vacated by either this or the Supreme Court. The original plaintiffs were scheduled for execution in December of 2019. The case has been hard litigated and fought against. Of course, seven and six plaintiffs and several, and one more who is not a plaintiff, have been executed with this court and the Supreme Court's permission, essentially by vacating the only injunctions blocking them. At this point, we think that the equities strongly favor going forward with any more scheduled executions. Again, the only thing that has happened since that time is that they have received more process and they lost on the factual findings. I see I am over my time. Happy to answer any remaining questions. I do want to just, I'm not trying to throw up jurisdictional roadblocks, but just to prevent any future jurisdictional mishaps on the FDPA. I believe this morning that plaintiffs made the 54B motion that they adverted to in their reply brief. The United States does not oppose the 54B as to all plaintiffs on the FDPA claiming substance. It is not entirely clear to us that the district court retains jurisdiction to enter that, given the notice of appeal, defective though it was as to the FDPA. So I would just note the existence of the indicative ruling process in Prop 12.1 and in Federal Rule of Civil Procedure 62.1. I'm not taking a position on there. We have no interest in having this tied up in jurisdictional tangles, but we wanted to note that it is not clear to us that the procedural mechanism by which plaintiffs appear to be trying to remedy their jurisdictional problems are correct. My understanding is that the government has already agreed to follow the state, I think they're both convicted in Texas. The two that are up now on the stay motion have both been convicted in Texas and one or both have asked to be executed after six o'clock and the government has agreed to do that. Ms. Hall has asked to be executed after six o'clock and so that's when his execution has been scheduled. Bernard has not made a request. As with Hall, we said we'll consider granting it if he makes a timely request. The hour is usually chosen about a week before. But we think that that obviates the discrepancy that they've pointed to. Moreover, the district court, you know, even though they had not, the claim somewhat shifted. The original claim was that the whole protocol was no good because of this inconsistency. Of course, we think that's inconsistent with this court's prior opinion. I think the district court rightly thought that plaintiffs now wanted a court order directing compliance with Texas Provision 43.14 and sort of preemptively made the determination that an injunction would not be appropriate, given the lack of irreparable harm on that floor. So we don't think that there's any even conceivable basis for a remand or an injunction on that basis. And I should note, as explained at length in our brief, we think that that provision is not even incorporated in the FDP under proper construction of this court's prior opinion. We have had an exchange about whether under, if there were a situation where the Bureau of Prisons were administering drugs to prisoners generally without a prescription. And whether there could be any, you said there couldn't be a lawsuit under the FDCA, but you weren't aware if there was some other statute that the prisoners could sue under. Fairly enough, you weren't aware of the U.S. Code relevance of that point. Could you file a letter with the court by 10 o'clock tomorrow morning, advising if there are other statutes under which the United States believes they could sue to enforce the FDCA? And just to be clear, the scenario that Your Honor has in mind is where BOP, I'm writing this down because I want to get it right, is administering prescription drugs within the meaning of FDCA. Otherwise prescription drugs, yes, without a prescription to prisoners. Pardon? Prisoners generally. They just say, we don't want to pay for work, we're not going to do prescriptions inside our prison walls. The people in our prison walls, they don't get prescriptions. We will file a letter on that topic by 10 a.m. tomorrow. Thank you, Your Honor. Any more questions from my colleagues? Okay, Mr. Metzler, we'll give you three minutes to rebuttal. Mr. Berlusi, I apologize. Thank you. Thank you, Your Honor. I'd like to turn back to Judge Pillard's hypothetical, if I could. So the BOP is administering a drug for a heart condition without a prescription, non-death penalty prisoners. And let's say there's some risk that the drug will cause heart attacks in its recipients. The prescription requirement ensures that a trained medical professional will assess those risks, will look at the available precautions to take based on the current medical science, and take documented steps to avoid those risks. Like, for example, adding another drug to address the risk. Even if the probability of heart attacks may be less than 50%. But in that hypothetical, by evading those statutory requirements, the BOP would necessarily expose prisoners to a risk of bodily harm. We believe that constitutes irreparable harm, and that's just what courts held in the COVID cases that we cite in our brief. And to address Judge Millett's point, now, does that scenario rise to the level of a constitutional violation? The answer may be, maybe not. But even if it doesn't rise to deliberate indifference, we submit it's harm for purposes of the statutory violation. It's irreparable harm that can be remedied through enjoining the defendants and the BOP to comply with their statutory requirements. Judge Millett, you asked about a punch to the stomach. And my friend's answer was, that's so far from the allegations here. We agree this is much, much more what we have shown through our evidence, and what the district court itself credited when it said it continues to be concerned by the possibility that plaintiffs will suffer excruciating pain. What that means is plaintiffs will now face the prospect of their execution with a possibility, at least, that they will suffer pain that's been described as akin to torture, knowing that the district court said there's a possibility that that will occur. We submit that harm is real and concrete and certain. And to conclude that it isn't irreparable harm here because the probability that they suffer that torturous pain is somewhere less than 50%, we submit should not stand. The last point I'd make is just going back to the APA where I started. We sincerely hope that a declaratory judgment and setting aside the protocol based on defendant's violations of law should be enough to prevent defendants from continuing to act contrary to law. So we believe that, at the very least, that should be ordered as mandated by Section 705, the shale language, excuse me, 706. To the extent more is needed, we believe that the irreparable harm is present here and the district court erred in holding otherwise. Unless your owners have any other questions. Any questions from my colleagues? Thank you very much. Okay. Any more questions from my colleagues? Thank you for... Meltzer gets some... No. If you want to ask him a question, I'll certainly give him time. Mr. Meltzer, would you like a minute? There you go. I'm happy to rest on Mr. Garbuski's rebuttal unless the court has questions. Okay. Thank you very much. No questions. Thanks. Thanks. We appreciate the emergency preparation for it and the cases committed.
judges: Millett, Pillard, Rao